UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENVIRONMENTAL AND TECHNICAL
CONTROLS, INC.,

           Plaintiff,                            Case No: 12-12834

vs.                                             HON. AVERN COHN

DETROIT TRANSPORTATION
CORPORATION,

           Defendant.
_____/

**MEMORANDUM AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (Doc. 32) AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 33)**

**I. INTRODUCTION**

This is a breach of contract case. Plaintiff Environmental and Technical Controls, Inc. ("Plaintiff") is suing Defendant Detroit Transportation Corporation ("Defendant"), a Public Body Corporate, claiming that Defendant breached a professional services contract by terminating the contract without justification.[1] The contract, which Plaintiff obtained through a bidding process, required Plaintiff to clean the dirt, debris, and rust from the guideway deck and supporting expansion columns of the Detroit People Mover, which is owned by Defendant.

Defendant says that Plaintiff materially breached the contract, and, therefore, Defendant's termination was permissible "for cause," as specifically defined in the contract. In addition, Defendant says it had discretion to terminate the contract "for convenience."

---

[1] Plaintiff also sued the City of Detroit (the "City"). In a prior order, the Court dismissed the claims against the City. (Doc. 11).

Plaintiff says that it did not materially breach the contract and that Defendant's termination of the contract was a material breach. Plaintiff seeks damages to be made whole had it been able to complete the services required under the contract. Plaintiff also says that it is owed for services that were completed in 2011.

The first amended complaint (Doc. 4) is in three counts:

Count I  Breach of Contract

Count II  Procedural Due Process Violation Under 42 U.S.C. § 1983

Count III  Substantive Due Process Violation Under 42 U.S.C. § 1983

Now before the Court is Defendant's Motion for Summary Judgment on all claims (Doc. 32) and Plaintiff's Motion for Partial Summary Judgment as to liability on the breach of contract claim (Doc. 33). For the reasons that follow, Defendant's motion is GRANTED IN PART and DENIED IN PART and Plaintiff's motion is DENIED.

## II. BACKGROUND

**A. The Contract**

Defendant owns the Detroit People Mover (the "DPM"). The DPM is an aboveground light rail system consisting of 2.9 miles of guideway tracks and 65 expansion columns operating in downtown Detroit.

Defendant contracted Plaintiff under Contract No. 10.005R (the "contract"), requiring Plaintiff to clean, by water/steam pressure washing (*i.e.*, power washing), the guideway deck and supporting expansion columns of the DPM. (Doc. 31-2). Plaintiff was the lowest responsible bidder after being invited to bid on the contract.

The contract was to be performed in three successive years. Each year Plaintiff was required to repeat the work and clean the entire 2.9 miles of guideway tracks and 65

2

expansion columns. To begin each year's work, the contract provided that Defendant send Plaintiff a "notice-to-proceed." (Doc. 31-2 at 7). The scheduled time for performing the services each year was to be determined by Defendant. (*Id.*).

Plaintiff was to be paid $248,000 in 2010, $248,000 in 2011, and $270,000 in 2012. (*Id.* at 9). The fee schedule stated:

> Annual amounts shall be invoiced to [Defendant] on a bi-monthly basis covering actual work performed by [Plaintiff] and be based on . . . the following Schedule-of-Values approved by [Defendant] and [Plaintiff]:
>
> | | |
> |---|---|
> | 65 expansion columns | $48,000 |
> | 2.9 miles of guideway surface | $200,000 |

(*Id.* at 28).

The contract placed multiple requirements on Plaintiff. A summary of the relevant contractual terms follows:

- Section 2.02 of the contract stated that Plaintiff "shall perform in a satisfactory manner as shall be determined within the sole and reasonable discretion of [Defendant]. In the event that there shall be any dispute between the parties with regard to the extent, character and progress of the Services to be performed or the quality of performance under this Contract, the interpretation and determination of [Defendant] shall govern." (Doc. 31-2 at 5–6).

- Section 2.03 of the contract stated that Plaintiff "shall confer as necessary and cooperate with [Defendant] in order that the Services may proceed in an efficient and satisfactory manner. (*Id.* at 6).

- Section 10 of the contract (Default and Termination) provided guidelines for Defendant's termination of the contract either "for cause" or "for convenience." (*Id.* at 13–15).

- Section 16.01 of the contract provided that Defendant "may consider it in its best interest to change, modify or extend a covenant, term or condition of this Contract or require [Plaintiff] to perform Additional Services. . ." subject to proportionally adjusting, either by increasing or decreasing, the compensation due Plaintiff as a result of the modification. (*Id.* at 17).

3

- Section 304 of the Scope of Services provided that the Plaintiff "shall provide sufficient personnel to perform the work . . . in a timely fashion. Personnel must be fully trained in the use of pressurized wash and vacuum techniques and equipment." (*Id.*). To satisfy the training requirements, the contract provided that all of Plaintiff's "personnel must go through a safety training course with [Defendant]'s Safety Manager prior to commencing work." (Doc. 31-5 at 3).

- The contract allowed Defendant to withhold payment to Plaintiff if (a) the work was defective and the defects were not remedied; or (b) Plaintiff was in material breach of the contract. (Doc. 31-2 at 29).

- Section 306 of the Scope of Services provided that Plaintiff was to use pressurized cold water at not more than 1500 psi at each individual pressure wand. (Doc. 31-5 at 3–4).

- Section 306 of the Scope of Services stated that "[t]he performance of this guideway cleaning cannot be performed in temperatures below 35°F." (*Id.* at 4).

- Section 307 of the Scope of Services required Plaintiff to report to Defendant's Maintenance Control Facility ("MCF") by calling in at least 30 minutes before beginning each day's work. In addition, Plaintiff was required to return to the MCF to sign out at the conclusion of each day's work. (*Id.* at 5).

**B. Plaintiff Begins Work**

In November, 2010, Plaintiff received a work authorization permit ("WAP") from Defendant and began performing under the contract for the 2010 calendar year. By December 14, 2010, Plaintiff had cleaned 18 of the 65 expansion columns and submitted an invoice to Defendant for $49,555.27. (Doc. 31-8). After multiple costs were subtracted from the invoice, Plaintiff was paid $47,882.45 in full satisfaction of its work through December 14, 2010.

However, towards late December, the temperature dropped below 32°F and work was stopped. (Doc. 31-3 at 6). The parties met in December, 2010 to discuss moving forward for completing the 2010 schedule. It was agreed that the work that was to be

4

performed in the 2010 calendar year would be completed in 2011.  Plaintiff's president Larry Wiggins ("Wiggins") testified at his deposition that he was told that Plaintiff could continue the work for the 2010 calendar year in February, 2011.  (*Id.* at 7).

Because Plaintiff was delayed and had to complete the work for the 2010 calendar year in 2011, the parties discussed extending the contract through 2013 to allow Plaintiff to complete three successive cleaning cycles as anticipated by the contract.  (Doc. 43-4 at 5; Doc. 43-14 at 2).

**C. Plaintiff Remobilizes And Continues Work In August, 2011**

Although Plaintiff was supposed to continue the work for the 2010 calendar year in February, 2011, Wiggins testified at his deposition that budgetary issues prevented work from continuing in February.  (Doc. 31-3 at 7).  After these issues were resolved, Plaintiff continued the work for the 2010 calendar year in August, 2011.

Multiple issues arose between the parties after the work continued in August.  On multiple occasions, Defendant's maintenance manager Ernest Latham, Jr. ("Latham") reprimanded Plaintiff for failing to contact Defendant's MCF prior to commencing work, or when work was completed for the day.  (Doc. 31-12 at 2).  In addition, the project was suspended for one day on August 30, 2011 because Plaintiff did not have a pressure gauge to ensure that the water pressure level being used was below 1500 psi as required by the contract.  Work continued after Plaintiff purchased a pressure gauge.

**D. Defendant Instructs Plaintiff To Clean The Guideway Deck**

The problems between the parties intensified after Defendant instructed Plaintiff to begin cleaning the guideway deck of the DPM.  On September 7, 2011, Latham e-mailed Wiggins: "Starting tomorrow night please have your crews begin cleaning of the guideway

deck. The work will begin at Fort Cass station and proceeding towards Michigan station."

(Doc. 31-17 at 2). Up until this point, Plaintiff had only cleaned the expansion columns.

Latham explained the reason he directed Plaintiff to start cleaning the guideway deck:

> [S]o we could get better headway on the project, because that way if we get all of the decks clean, then it won't ever be an issue of going back, cleaning the column, you know, doubling back. Just get the deck going, get it cleaned, then we can go back, clean the columns.

(Doc. 31-4 at 7).

Despite Latham's directive to begin cleaning the guideway deck, Wiggins sent Latham a proposed work schedule that did not reflect the cleaning of the guideway deck. On September 8, 2011, Latham told Wiggins that Plaintiff should adjust its schedule and begin cleaning the guideway deck. (Doc. 31-18 at 2). In addition, Latham directed Wiggins to "[h]ave any untrained [Plaintiff] personnel report at 10:30 for training. . . ." (Doc. 31-19 at 2).

**E. Work Is Suspended**

By September 21, 2011, Plaintiff had not submitted an adjusted schedule to Defendant nor had it sent employees for training on how to clean the guideway deck. Defendant suspended the project. Latham e-mailed Wiggins stating:

> All activities related to Work Authorization Permit #00-0824 are suspended immediately until further notice. [Plaintiff] is not compliant with the following Terms and Conditions of the Work Authorization Permit. [Plaintiff] was directed by Ernest Latham via email to cease guideway cleaning and begin deck cleaning on 9/9/11. This was also verbally communicated between Ernest Latham and Larry Wiggins on 9/16/11. After review of [Defendant's] project notes it shows that column cleaning was performed on 9/17 and 9/21.
>
> This is the second series of circumstances that show disregard for [Defendant's] procedures and directives. In the first instance [Plaintiff] neglected to activate the

6

WAP before starting work."

(Doc. 31-23 at 2).[2]

In joint statement of fact number 36 to Defendant's motion for summary judgment, Plaintiff admits that it did not begin cleaning the guideway deck:

> 36. At no time did Plaintiff perform any power washing of the guideway surface with water as required by the Contract; and only 5% of the track surface was air cleaned. (Ex. 2, p. 98–99; Exhibit 25, Request for Work Continuation).
>
> **RESPONSE**
> Not controverted by Plaintiff. Deemed admitted.

(Doc. 46 at 16).

Plaintiff says that it did not begin cleaning the guideway deck cleaning because its employees were not trained in such activity.

## F. Plaintiff Submits Invoice For Work Performed

The day after Defendant suspended the project Plaintiff submitted an invoice to Defendant for "completed work" on the "Expansion Columns and Guideway as part of contract number 10-005R." (Doc. 31-27 at 2). The invoice was for services rendered between August 13, 2011 and September 21, 2011 in the amount of $115,000. (*Id.* at 3). Of the total amount of the invoice, $100,000 represented column cleaning and $15,000 represented cleaning the guideway deck. (*Id.*). This invoice has not been paid.

## G. Defendant Informs Plaintiff That It Is In Default

On September 30, 2011, Defendant's counsel Lawrence Shoffner ("Shoffner") e-mailed Wiggins informing him that Plaintiff was in default of its contractual obligations:

---

[2] The statement that Plaintiff neglected to activate the WAP before starting work refers to Plaintiff's failure to check in with Defendant's MCF prior to commencing work on September 2, 11, and 15.

> Mr. Wiggins,
>
> Despite [Plaintiff]'s various defaults in performance of the contract, [Defendant] will allow [Plaintiff] to proceed with the work, but only upon the attached terms and conditions. Please execute the attached document, scan it and return it to me via email. An original should be delivered directly to [Plaintiff]'s offices.
>
> Sincerely,
>
> Lawrence Shoffner, Esq

(Doc. 31-28 at 2).

Attached to the e-mail was a forbearance agreement. The agreement required Plaintiff to acknowledge that it was in default of its obligations, and that Defendant was entitled to terminate the contract for cause. (*Id.* at 3). The agreement also provided that Plaintiff would not be paid until it substantially completed the work. (*Id.*).

Plaintiff did not sign the forbearance agreement.

### H. Defendant Terminates The Contract

On October 20, 2011, Defendant terminated the contract. The termination letter sent to Wiggins from Defendant stated, in pertinent part:

> After meeting with [Plaintiff]'s representatives, I have decided that [Plaintiff] has materially breached the Contract by: (1) refusing to wash the DPM guideway areas *before* washing their related columns, as specially directed by [Defendant]'s Maintenance Manager on September 7, and September 8, 2011; and (2) repeatedly failing or refusing to sign in before beginning each day's work, or to sign out at the conclusion of each day's work, as [Defendant] admitted during our meeting. [Defendant] also rejects as non-conforming the column-cleaning work performed by [Plaintiff], for the reason that the columns will need to be re-cleaned after the guideway is properly washed. Additionally, [Plaintiff] has overcharged [Defendant] for the (non-conforming) cleaning that [Plaintiff] performed.

(Doc. 31-30 at 3).

In addition, the letter stated:

> [Defendant] also has the right to terminate this Contract, at any time, at its

convenience, by giving [Plaintiff] five (5) business-days' written Notice of Termination for Convenience. In the event the previous findings are re-determined on appeal, [Defendant] alternatively exercises its right to terminate the Contract [for convenience] pursuant to Contract §10.03."

(*Id.*).

## I. Plaintiff Appeals Defendant's Decision

Plaintiff responded to Defendant's letter on October 31, 2011 prompting an internal appeal of the decision to terminate the contract before Defendant's Board of Directors. (Doc. 31-31). A hearing took place on November 17, 2011. Plaintiff was represented by counsel.

At the hearing, Wiggins was asked to provide phone records confirming that he reported to Defendant's MCF before beginning each day's work, and at the conclusion of the work day. Wiggins did not provide the phone records.

The decision to terminate the contract was ultimately upheld by Defendant. A separate communication was not sent to Plaintiff.

Plaintiff filed this action in state court on May 24, 2012. Defendant removed it to this Court on federal question grounds.

## III. LEGAL STANDARD

The summary judgment standard of review under Fed. R. Civ. P. 56 is well known and not repeated here. Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

## IV. DISCUSSION

### A. Breach Of Contract

#### 1. The Law

As the Michigan Supreme Court[3] has explained, " '[t]he cardinal rule in the interpretation of contracts is to ascertain the intention of the parties.' " *Shay v. Aldrich*, 487 Mich. 648, 661 (2010) (citing *McIntosh v. Groomes*, 227 Mich. 215, 218 (1924)). If the language of a contract is unambiguous, "it is to be construed according to its plain meaning." *Id.* (citing *Grosse Pointe Park v. Mich. Muni. Liability & Prop. Pool*, 473 Mich. 188, 197–98 (2005)). If the language of a contract is ambiguous, "courts may consider extrinsic evidence to determine the intent of the parties." *Id.* (citation omitted).

In addition, if a party materially breaches a contract, the other party may rescind the contract. *Omnicom of Mich. v. Giannetti Inv. Co.*, 221 Mich. App. 341, 348 (1997) (per curiam). As the Michigan Court of Appeals has explained, "[i]n order to warrant rescission of a contract, there must be a material breach affecting a substantial or essential part of the contract." *Id.* (citing *Holtzlander v. Brownell*, 182 Mich. App. 716, 721 (1990)).

#### 2. Analysis

##### a. Defendant properly terminated the contract "for cause"

The contract's Default and Termination section provided Defendant with the right to terminate the contract "for cause" for multiple reasons. In Defendant's letter terminating the contract,[4] Defendant cited three of these reasons contained in Section 10.2(8)–(10) as

---

[3] Section 24.05 of the contract provides that Michigan law applies. (Doc. 31-2 at 22).

[4] Plaintiff argues that the October 20, 2011 letter was not a "termination" letter because it was unclear. The Court disagrees. The letter clearly states that the contract was

grounds for termination. As explained in the letter, the contract could be terminated if:

> (8) [Plaintiff] violates any of the provisions of this Contract, or disregards applicable laws, ordinances, permits, licenses or orders of the City; or
>
> (9) The performance of the Contract, in the sole judgment of [Defendant], is substandard, nonprofessional, or faulty and not adequate to the demands of the task to be performed; or;
>
> (10) [Plaintiff] fails in any of the agreements set forth in the Contract.

(Doc. 31-2 at 13–14).

Pursuant to the terms of the contract, Defendant's termination for cause was justified.

Despite multiple reminders, Plaintiff did not call Defendant's MCF when beginning/completing work on multiple occasions, including September 2, 11, and 15, 2011. As Latham explained at his deposition, calling into Defendant's MCF at the beginning and end of each work day was critical because it allowed Defendant to have the necessary employees working:

> From a contractor side, from a contractor side of activating the permit, they, if it's stipulated, call the control center, they call the control center and control center will notify my shop so we can get the necessary people or make sure the necessary departments know that, you know, we have people doing something.

(Doc. 43-2 at 12).

Indeed, Latham testified at his deposition that calling into Defendant's MCF was essential so that Defendant "can do our part for the oversight." (*Id.*). Plaintiff's failure to call the MCF prior to beginning work and at the conclusion of the work day created a safety concern.

Although Plaintiff disputes the extent of its noncompliance with calling Defendant's

---

being terminated both "for cause" and "for convenience."

11

MCF prior to beginning work, it has failed to proffer any admissible evidence to support its position. Indeed, on appeal to Defendant's Board of Directors, Plaintiff was informed that it could provide its phone records to verify that it had only failed to call Defendant's MCF on one occasion. Plaintiff did not provide its phone records. Nor are Plaintiff's phone records proffered as an exhibit.

In addition, Defendant properly terminated the contract for cause under Sections 10.2(9) and (10). As explained above, the contract provided that Plaintiff "shall perform in a satisfactory manner as shall be determined within the sole and reasonable discretion of [Defendant]." (Doc. 31-2 at 5). To the extent that the parties disputed "the extent, character and progress of the Services to be performed or the quality of performance," the contract provided that "the interpretation and determination of [Defendant] shall govern." (*Id.* at 5–6). In addition, the contract provided that Plaintiff "shall confer as necessary and cooperate with [Defendant] in order that the Services may proceed in an efficient and satisfactory manner." (*Id.* at 6).

Despite multiple directives from Latham, Plaintiff did not begin cleaning the guideway deck for the 2010 calendar year. Wiggins explained at his deposition why he decided to continue cleaning the expansion columns prior to the guideway deck:

> [Latham is] the maintenance manager, but again, this contract says [Plaintiff] is an independent contractor not an employee of the city of Detroit or the People Mover, and with that we have a couple things in autonomy in terms of the method, the procedure and the sequence of work. Okay? All of those things were approved.
>
> The method is pressure washing no higher than 2500 [sic] PSI. The procedure and the sequence also was well established and accepted. Okay?
>
> We cannot say we're an independent contractor when Ernie's dictating where we go, what we do when we do it. Okay? He's not running my crew.

12

(Doc. 31-3 at 13–14).

Wiggins's decision to disregard Latham's directive was both against the express terms of the contract and a material breach. The contract called for Defendant to manage the scope and the manner of the cleaning services provided by Plaintiff. Defendant decided that the guideway deck should be cleaned prior to the columns for efficiency reasons. Plaintiff's disregard for Defendant's multiple directives substantially affected its performance of the contract constituting a material breach. Accordingly, under its express terms, Defendant was justified in terminating the contract.

To the extent that Plaintiff argues that it could not start the guideway deck cleaning because its employees lacked the necessary training, its argument fails. Latham directed Wiggins to "[h]ave any untrained [Plaintiff] personnel report at 10:30 for training. . . ." (Doc. 31-19 at 2). Wiggins ignored this directive and other opportunities to send employees for training.

### b. Alternatively Defendant permissibly terminated the contract "for convenience"

Even if Defendant's termination "for cause" was not justified, Defendant terminated the contract "for convenience" pursuant to its express terms. As explained above, Section 10 of the contract allowed Defendant to terminate the contract at any time "for convenience" by giving Plaintiff five business-days' notice. In the October 20, 2011 termination letter, Defendant stated: "In the event the previous findings are re-determined on appeal [before Defendant's Board of Directors], [Defendant] alternatively exercises its right to terminate the Contract [for convenience] pursuant to Contract §10.03." (Doc. 31-30 at 3). Defendant clearly stated that the contract was alternatively terminated for

13

convenience.[5]

> **d. A genuine issue of material fact exists as to whether Plaintiff's performance between August 13, 2011 and September 21, 2011 was conforming, and, if so, the amount Plaintiff is owed for this work**

Despite the fact that Defendant permissibly terminated the contract, a question of fact remains as to whether Plaintiff is owed for work performed between August 13, 2011 and September 21, 2011, and, if so, what amount Plaintiff is owed.

Defendant contends that the work performed between August 13 and September 21 was nonconforming because Plaintiff did not follow Latham's directive to clean the guideway deck before the columns. In addition, Defendant argues that Plaintiff was already paid $47,882.45 for cleaning columns in December, and that the contract provides that $48,000 represents the total for cleaning *all* of the columns in a given year. Therefore, Defendant argues that Plaintiff was already paid in full for the column cleaning for the 2010 calendar year.

---

[5] Plaintiff's argument that Defendant had to comply with Federal Transit Administration ("FTA") guidelines in terminating the contract is without merit. Federal funds were not used in association with the contract. The contract, which does not mention FTA guidelines, contains an integration clause stating that the contract "contains the entire agreement between the parties. . . ." (Doc. 43-3 at 21). Therefore, the FTA guidelines were not incorporated in the contract. Defendant was not bound by the FTA guidelines. For the same reasons, Plaintiff's reliance on any terms contained in the Invitation For Bid ("IFB"), prior to entering into the contract, is misplaced. The contract contains the full understanding of the parties and supercedes the IFB.

In addition, Plaintiff's argument that Defendant's delay in the start of the contract was a material breach fails to persuade. The initial delay occurred because the temperatures dropped below freezing. The second delay, which is not explained in detail in the papers, was due to "budget issues." Nevertheless, Defendant permitted Plaintiff to continue the services that were to be provided in the 2010 calendar year beginning in August, 2011. In addition, Defendant explained to Plaintiff that it would extend the contract through 2013 to allow Plaintiff to perform three successive cleaning cycles as originally anticipated by the contract. Therefore, any delay was not a material breach on Defendant's part.

14

There are two problems with Defendant's argument. First, Latham did not inform Wiggins until September 7, 2011 that Plaintiff should begin cleaning the guideway deck. It is questionable, therefore whether the work performed from August 13 through September 7 was "nonconforming." The work could not have been nonconforming solely because Plaintiff did not begin cleaning the guideway deck if Defendant had not yet told it to clean the guideway deck first.

Second, although the Scope of Services provided that $48,000 represented the entire amount of cleaning all 65 columns, Defendant paid Plaintiff $47,882.45 for cleaning only *18* of the 65 columns from November, 2010 through December, 2010. Therefore, Defendant's position that Plaintiff was already paid for the entirety of the work it performed for the 2010 calendar year is inconsistent with its prior payment to Plaintiff. This inconsistency cannot be resolved on summary judgment.

In sum, it remains unclear what amount, if any, Plaintiff is owed for work performed from August 13, 2011 through September 7, 2011. A jury must decide whether Plaintiff's work was conforming, and, if so, what amount Plaintiff is owed.

**B. § 1983 Claims**

Defendant is entitled to summary judgment on counts II and III (procedural and substantive due process).

**1. Procedural Due Process**

Plaintiff's procedural due process claim is premised on its position that Federal Transit Administration guidelines were incorporated in the contract and were not followed

by Defendant when it terminated the contract.[6]  It is undisputed that Defendant did not follow the FTA guidelines when terminating the contact.  However, as explained in footnote 5 above, the FTA guidelines were not incorporated in the contract because federal funds were not obtained for the project, and the contract contains an integration clause but does not mention FTA guidelines.

Plaintiff was provided with the opportunity to appeal Defendant's decision to terminate internally to Defendant's Board of Directors.  Plaintiff, in fact, took advantage of this process and appealed the decision through its counsel.  Plaintiff was invited to provide the Board of Directors with phone records to prove that Defendant's MCF was called prior to beginning each work day.  Plaintiff did not provide the requested phone records.

Given that Plaintiff was provided the opportunity to appeal the decision to Defendant's Board of Directors, and it did so, it was provided with and took advantage of the procedural due process available.  Defendant is, therefore, entitled to summary judgment on the procedural due process claim.

### 2. Substantive Due Process

As to the substantive due process claim, Plaintiff does not have a protected property interest in the contract at issue.  *See Charles v. Baesler*, 910 F.2d 1349, 1355–56 (6th Cir. 1990) ("[T]he Constitution must not be trivialized by being dragged into every personal dispute in state and local government.").  As the Sixth Circuit explained in *Charles*, where a party may readily seek compensation for breach of contract, the party lacks a property interest sufficient to state a violation of substantive due process.  *Id.* at 1355.  Plaintiff fails

---

[6] See discussion of FTA guidelines*, supra* at 14 n.5.

to cite any authority to the contrary. In addition, as explained above, Defendant properly terminated the contract. Thus, Defendant is entitled to summary judgment on the substantive due process claim.

## V. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment was granted in part and denied in part, and Plaintiff's motion for partial summary judgment was denied. Specifically, as explained above:

1) The contract was properly terminated by Defendant and Defendant is entitled to partial summary judgment on the breach of contract claim insofar as Plaintiff seeks damages related to the termination or for work it could have performed but for the termination;

2) Summary judgment will be denied to both Defendant and Plaintiff on a portion of the breach of contract claim as a question of fact remains as to whether Plaintiff is entitled to compensation for work performed from August 13, 2011 through September 21, 2011, and, if so, the amount Plaintiff is entitled to; and

3) Defendant is entitled to summary judgment on the § 1983 procedural and substantive due process claims.

SO ORDERED.

    S/Avern Cohn
UNITED STATES DISTRICT JUDGE

Dated: April 4, 2014

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, April 4, 2014, by electronic and/or ordinary mail.

    S/Sakne Chami
Case Manager, (313) 234-5160